Shaw, C. J.*
Several questions have been argued, in the present case, upon exceptions taken by the defendant, some of them arising upon the face of the report, which were taken at the trial and overruled, and some of them being exceptions to the rejection of evidence offered at the trial, with a view to impeach and set aside the award.
It is clearly settled, that an award is prima facie binding up on the parties, and the burden of proof is upon the party who would avoid it. In general, arbitrators have full power to decide upon questions of law and fact, which directly or incidentally arise in considering and deciding the questions embraced m the submission. As incident to the decision of the questions of fact, they have power to decide all questions as to the admission and rejection of evidence, as well as the credit due to evidence, and the inferences of fact to be drawn from it. So, when not limited by the terms of the submission, they have authority to decide questions of law, necessary to the decision of the matters submitted; because they are judges, of the parties’ own clnoosing. Their decision upon matters of fact and law, thus acting within the scope of their authority, is conclusive, upon the same principle that a final judgment of a court of last resort is conclusive; which is, that the party against whom it is rendered can no longer be heard to question it. It is within *166 the principle of res judicata; it is the final judgment for that case, and between those parties. It is amongst the rudiments of the law, that a party cannot, when a judgment is relied on to support or to bar an action, avoid the effect of it by proving, even if he could prove to perfect demonstration, that there was a mistake of the facts or of the law. But this general rule is to be taken with some exceptions and limitations, arising either from the submission, or from the award itself, or from matter distinct from either.
If the submission be of a certain controversy, expressing that it is to be decided conformably to the principles of law, then both parties proceed upon the assumption that their case is to be decided by the true rules of law, which are presumed to be known to the arbitrators, who are then only to inquire into the facts, and apply the rules of law to them, and decide accordingly. Then if it appears by the award, to a court of competent jurisdiction, that the arbitrators have decided contrary to law — of which the judgment of such a court, when the parties have not submitted to another tribunal, is the standard — the necessary conclusion is, that the arbitrators have mistaken the law, which they were presumed to understand; the decision is not within the scope of their authority, as determined by the submission, and is for that reason void. But when the parties have, expressly or by reasonable implication, submitted the questions of law, as well as the questions of fact, arising out of the matter of controversy, the decision of the arbitrators on both subjects is final. It is upon the principle of res judicata, on the ground that the matter has been adjudged by a tribunal which the parties have agreed to make final, and a tribunal of last resort for that controversy; and therefore it would be as contrary to principle, for a court of law or equity to rejudge the same question, as for an inferior court to rejudge the decision of a superior, or for one court to overrule the judgment of another, where the law has not given an appellate jurisdiction, or a revising power acting directly upon the judgment alleged to be erroneous.
It has sometimes been made a question whether the court will not set aside an award, on the ground of mistake of the *167 law, when the arbitrator is not a professional man, and decline inquiry into such mistake, when he was understood, from his profession, to be well acquainted with the law. Some of the earlier cases may have countenanced this distinction. But the probability is, that this distinction was taken, rather by way of instance to illustrate the position, that when the parties intended to submit the questions of law as well as of fact, the award should be final, but otherwise not; which we take to be the true principle. But we think the more modern cases adopt the principle, that inasmuch as a judicial decision upon a question of right, by whatever forum it is made, must almost necessarily involve an application of certain rules of law to a particular statement of facts, and as the great purpose of a submission to arbitration usually is, to obtain a speedy determination of the controversy, a submission to arbitration embraces the power to decide questions of law, unless that presumption is rebutted by some exception or limitation in the submission.
We are not aware that there is anything contrary to the policy of the law, in permitting parties thus to substitute a domestic forum for the courts of law, for any good reason satisfactory to themselves; and having done so, there is no hardship in holding them bound by the result. Volenti non jit injuria. On the contrary, there are obvious cases, in which it is highly beneficial. There are many cases, where the parties have an election of forum; sometimes it is allowed to the plaintiff, and sometimes to the defendant. It may depend upon the amount, or the nature of the controversy, or the personal relations of one or other of the parties. As familiar instances in our own practice, one may elect to proceed in the courts of the United States, or in a state court; at law or in equity; in a higher or lower court. In either case, a judgment in one is, in general, conclusive against proceeding in another. A very common instance of mailing a judgment conclusive by consent, is where a party agrees, in consideration of delay, or some advantage to himself, to make the judgment of the court of common pleas conclusive, where, but for such consent, he would have a right to the judgment of the higher court.
*168 But where the whole matter of law and fact is submitted, it may be open for the court to inquire into a mistake of law, arising from matter apparent on the award itself; as where the arbitrator has, in his award, raised the question of law, and made his award in the alternative, without expressing his own opinion ; or, what is perhaps more common, where the arbitrator expresses his opinion, and, conformably to that opinion, finds in favor of one of the parties; but if the law is otherwise, in the case stated, then his award is to be for the other party. In such case, there is no doubt, the court will consider the award conclusive as to the fact, and decide the question of law thus presented.
Another case, somewhat analogous, is where it is manifest, upon the award itself, that the arbitrator intended to decide according to law, but has mistaken the law. Then it is set aside, bécause it is manifest that the result does not conform to the real judgment of the arbitrator. For then, whatever his authority was to decide the questions of law, if controverted, according to his own judgment, the case supposes that he intended to decide as a court of law would decide; and therefore, if such decision would be otherwise, it follows that he intended to decide the other way.
Another ground for setting aside the award is a mistake of fact, apparent upon the award itself; and this is held to invalidate the award, upon the principle stated in the preceding proposition, that the award does not conform to the judgment of the arbitrators, and the mistake, apparent in some material and important particular, shows that the result is not the true judgment of the arbitrators. The mistake, therefore, must be of such a nature, so affecting the principles upon which the award is based, that if it had been seasonably known and disclosed to the arbitrators, if the truth had been known and understood by them, they would probably have come to a different resu.t. A. familiar instance of this class of mistakes, is an obvious error in computation, by which the apparent result, in sums or times, or other things of like kind is manifestly erroneous. In *169 such case, it is clear that the result stated is not that intended; it does not express the real judgment of the arbitrators.
The class of cases in which the court will set aside an award, upon matter not arising out of the submission or award, is, where there is some corruption, partiality or misconduct on the part of the arbitrators, or some fraud or imposition on the part of the party attempting to set up the award, by means of which the arbitrators were deceived or misled. In neither of these cases is the result the deliberate and fair judgment of the judges chosen by the parties; the former is the result of prejudice, uninfluenced by law and fact; the latter may be a true judgment, but upon a case falsely imposed on them by the fraud of a party.
Under this class of cases, where the award may be set aside, upon matter not arising out of the submission or award, another was stated at the trial; that is, where the arbitrators make a mistake in matter of fact, by which they are led to a false result. This would not extend to a case where the arbitrators come to a conclusion of fact erroneously, upon evidence submitted to and considered by them, although the party impeaching the award should propose to demonstrate that the inference was wrong. This would be the result of reasoning and judgment, upon facts and circumstances known and understood; therefore a result which, upon the principles stated, must be deemed conclusive. But the mistake must be of some fact, inadvertently assumed and believed, which can now be shown not to have been as so assumed; and the principal illustration was that of using a false weight or measure, believing it to be correct. Suppose, as a further illustration, that a compass had been used to ascertain the bearings of points; and it should be after-wards found, that by accident, or the fraud of a party, a magnet had been so placed as to disturb the action of the needle, and this wholly unknown to the arbitrators ; it is not a fact, or the inference of a fact, upon which any judgment or skill had been exercised, but a pure mistake, by which their judgment, as well as the needle, had been swerved from the true direction, which it would have taken, had it followed the true law under *170 stood to govern it. One test of such a mistake is, that it is of such a kind, and so obvious, that when brought to the notice of the arbitrators, it would induce them to alter the result to which they had come in the particular specified. It is not to be un-de:stood that such mistake can be proved only by the testimony or by the admission of the arbitrators. They may, from various causes, be unable to testify, or may not be able to recollect the facts and circumstances sufficiently. It is not therefore, as matter of law, confined to a case of mistake admitted or proved by the arbitrators; but it must be of a fact upon which the judgment of the arbitrators has not passed as a part of their judicial investigation, and one of such a nature, and so proved, as to lead to a reasonable belief, that they were misled and deceived by it, and that if they had known the truth, they would have come to a different result.
With these general remarks, we will proceed more directly to the case under consideration. The Water Power Company have brought an action of covenant against Mr. Gray, to recover about $ 1400, being a proportionable part of the cost of a machine, directed to be set up, by the award of the commissioners, for the purpose of measuring the water used at his mills, and ascertaining the quantity. This is resisted by the defendant, on the ground that the award is not binding upon the parties, but is void, for several reasons specifically stated. If the amount sued for in this action were the whole amount involved .n the controversy, it would be of comparatively little importance. But the question, whether the award is valid or not, extends to other consequences, which are understood to be of much greater importar ce.
The objections of the defendant to the award are resolved into two classes, namely, 1st, departure from the authority vested in the arbitrators by the submission, and 2d, palpable errors and mistakes.
The power of the arbitrators, denominated, by the parties, commissioners, is to be sought in the submission; that being the instrument by which it was conferred. In expounding it, in order to ascertain the intent, every part of the instrument may *171 be referred to; the preamble and recital, the lease referred to in the recital, the express delegations of power, and the several and respective covenants and stipulations. It recites a lease previously made to the defendant, by the Boston and Roxbury Mill Corporation, to whom the plaintiffs, the Water Power Company, had become successors by assignment. The Boston and Roxbury Mill Corporation, and also the Boston Iron Company, to whom the defendant had underlet a part of the premises, are made parties to the submission, rather, as we are to presume, to obtain their "assent to the proceedings, and bind them by the result, than because any claim was made by or against them.
By thus reciting the lease, and making it the basis of the proceeding, the whole lease, with all its provisions, grants and stipulations, is referred to, and makes part of the submission, as much as it it had been set out in words. These two instruments together constitute the submission. The recital is of some importance, by setting out what were understood to be the questions in controversy, and what was the purpose of the parties, in making the submission. It recites that questions and controversies had arisen between the parties, respecting the quantities of water, to which said Gray, and those claiming under him, are entitled, and the mode of measuring and delivering the sam©j and the quantities of water, which said Gray and others kai„ heretofore in fact used and enjoyed, and otherwise respecting the mutual rights and obligations of the parties, in regard to the nature and extent of the water power created by said basins and dams, and the manner of using the same; and recites also certain suits commenced and pending. The submission is then declared to be made for the purpose of determining said suits, controversies and questions, defining and limiting the mutual rights, powers and obligations of the parties, and regulating and securing the future enjoyment and fulfilment; of the same. Article 1st provides for the appointment of three commissioners, one of whom to be learned in the law, and the other two to be civil engineers, practically skilled in the measurement of water power, and learned in the scientific principles applicable thereto. It then proceeds to appoint Mr. Saltonstall as *172 chairman, and Messrs. Baldwin and Hayward as associates, with a provision for supplying vacancies. Article 2d makes it tbe duty of tbe commissioners to determine wbat quantities of water said Gray, and those claiming under him, are entitled to draw and use, by virtue of said lease, and to determine the manner in which the same shall be measured and delivered, and to define and settle, in all other particulars, the legal rights of the parties under said lease. Article 3d requires them to determine the facts and principles on which claims for past deficiencies or excesses shall be determined; but not to determinethe amount of damages. Article 4th provides that the commissioners, having ascertained and defined, are to declare by their award, the legal rights of the parties, in respect to the premises and all other matters submitted to them, including the legal principles by which damages are to be assessed by another board of ref erees, for the appointment of whom provision is made in the, same instrument. Article 5th prohibits the company from leasing any more water power, without the license and permission of the commissioners, until a final award. Article 6th provides for restraining the company, in case of deficiency, from using tne water, so as to secure to the defendant his full powers pending the controversy, and until an award. Article 7th directs the time and mode in which the final award shall be made and published; declares that it shall be final and conclusive upon all matters embraced therein, under this submission, and stipulating that each party shall specifically perform whatever shall be directed to be specifically performed by such party
There are various other articles, providing for incidental matters, such as the appointment of assistants and apportionment of the expenses, declaring what parties are to be affected and barred by the award, providing for the reference of the pending suits to another board of referees, the constitution of such board, filling vacancies, and incidental provisions. One or two clauses in these provisions, by indicating the intentions of the parties, may bear on the general question. It is provided, that this second board is to decide according to ,the principles and legal rights of the parties, as established by the *173 previous award of the commissioners, which is to be absolutely conclusive as to all matters which it purports to determine. So in a subsequent article, (12th,) such second set of referees shall settle and determine any principle of law, necessary to ascertaining the legal damages, provided such principle of law is not embraced in and determined by the previous award of the commissioners, and not in any respect repugnant to or conflicting with the principles established by the award of the commissioners, which are to govern, as aforesaid, in all matters therein embraced.
Such is this submission, apparently drawn under a distinct and comprehensive view of the nature and difficulties attending the inquiries to be conducted, and the controversies to be adjusted, and the provisions to be made, to prevent future contro versy; and with a manifest determination to make the decision conclusive. These judges, chosen by the parties, were perhaps designedly called commissioners, to indicate that they were invested with powers beyond those usually intrusted to arbitrators, in the ordinary administration of justice. That they were authorized to decide questions of law, does not depend upon implication arising from the appointment of a chairman who should be learned in the law; the power is conferred in express terms, and repeated again and again, as if to exclude the possibility of a doubt.
It seems equally clear, that every question of practical skill and of scientific principle, applicable to the subject matter, was intended to be conclusively determined, so far as they could affect the rights of these parties, upon the subject submitted to them, by their decision. And, in the opinion of the court, they were not only thus made the final judges of all questions of hew, of practical skill and science, coming directly in issue between the parties, but also of all collateral and incidental questions ; such as the admission and rejection of evidence, the manner in which all observations and experiments should be conducted, and the results reported, stated and compared ; and in general, as to the modes in which their inquiries and examinations «hould be conducted, availing themselves, according to their *174 own judgment, of the testimony of others, of books, and of their own experience and observation. It seems therefore to follow, that, as no misconduct or partiality is imputed to them, but on the contrary, both at the trial and on the argument, studiously disclaimed, the only question which can arise is, whether these commissioners, in the award which they have made, have exceeded their authority, or been themselves misled and deceived by some inadvertent mistake of fact, of such a nature, that the award is not the result of their own judgment.
We proceed now to consider the several objections to the award, in the order in which they were submitted on the argument.
1. That the commissioners exceeded their power, in awarding that Gray should, in any event, be required to take the water, for his works, at a lower level than the third gate at the City Mills, as it stood at the time of the execution of the lease, it then being at 5.6 feet above the bottom of the wheel. It is contended that, although he had a right, as lessee, to take the water at a lower height, yet that he was not bound to do so.
This objection is founded upon the terms of the lease, and it proceeds on the ground, undoubtedly correct, that the lease and instrument of submission are to be construed together, in determining the powers of the commissioners. In referring to the lease, we find a description of what shall constitute a mill power. It is “ a quantity of water, equal to that which is now required, under any given head and fall, to grind, with one of the water wheels, and one pair of mill stones, at the grist mill of the company, as the same are now constructed and set up, eight bushels of rye, into good merchantable meal in one hour.” The whole is a description of “ a quantity of water,” at any given height of head and fall. The object was to ascertain a quantity of water which, under any head and fall, would constitute a mill power, that is, do a certain quantity of work. The words “ as now constructed and set up ” describe an actually existing mill; and the quantity required at that mill was the quantity intended. But it is to be drawn through convenient flumes, wherever he may choose, within the limits of *175 the demised land. The right demised is, to draw a quantity .if water, the power of which shall be equal to ten mill powers. And in another clause it is expressly stipulated that the quantity or quantities of water, the power of which shall be always equal to the mill power or privilege before granted, shall be allowed to flow freely on the water wheels erected on the premises, and distributed in such proportions as said Gray, or his assigns, shall at any time require. The reference to the City Mills is solely to define the quantity of water which shall, at a given head and fall, constitute one such mill power; not to direct or limit the mode in which it shall be taken. Besides, we are strongly inclined to the opinion, that under a submission reciting that controversies had arisen as to the mode of using the water, and a submission is entered into, for the purpose of regulating and securing the future enjoyment of these rights, with full powers to the commissioners to construe the lease, it was competent to the commissioners to direct that the water should be taken at a lower level than 5.6 feet, if in their judgment such was the construction of the instrument, and such mode would secure the rights of the parties.
2. It is next objected to this award, as exceeding the authori ty of the commissioners, that they directed a measuring appara tus to be set up, in order to measure and ascertain the whole quantity of water used at Mr. Gray’s mills, at different heights of water in the full and empty basins, and in charging a part of the expense of this apparatus to him. Upon this point, it appears that it was stipulated in the original lease, that the lessee might at all times keep a gauge in any of the water courses on the premises, to regulate the power used according to the terms of said lease. The preamble of the instrument of submission recites that questions and controversies have arisen, respecting the mode of measuring and delivering the quantities of water, and the rights of the parties in regard to the nature and extent of the water power; and it is quite manifest, from, the whole terms of the instrument, that the lessee claimed that he had not had his due quantity, and the lessors claimed that he had taken a much larger quantity than he was entitled to *176 under the lease; a diversity of claims, arising probably from the inadequate mode of gauging, or otherwise ascertaining it, in the mode then in use. One declared purpose of the submission to learned, skilled and scientific commissioners, was, to regulate the future enjoyment of the mutual rights of the parties. It empowers them, after determining the quantities of water which Mr. Gray, and those claiming under him, may draw, also to determine the manner in which the same shall be measured. When power is given to provide for the accomplishment of a certain end, it carries with it, by reasonable implication, the power to direct the means by which it shall be done; being judged to be suitable and proper. The commissioners state that there is no convenient method known to them, for measuring, before using the same, the quantity of water necessary to give the said eight mill powers ; and they then go on to direct how the said apparatus shall be erected, used and paid for. They manifestly proceed upon the conviction, that without some mode of measuring and ascertaining the quantity of water used by the lessee, all the other means, devised and directed for ascertaining the rights of the parties under the lease, would be unavailing, iij the regulation of the future enjoyment of their mutual rights. We think, therefore, that under an authority to direct how, in future, water and water power should be measured, with a view to its future enjoyment, they had power to direct that a proper apparatus should be erected and maintained, and, as incident thereto, to direct how the expense of erecting and maintaining it should be apportioned. In a recent case, a cause respecting a certain hedge, ditch and pump was in controversy between adjoining proprietors; and it was referred to an arbitrator to award how and by whom said pump, ditch and hedge should in future be occupied and enjoyed, and who should have the care and management of them. It was held to be within the power of the arbitrator to decide that the pump was the property of one, that the other should have the joint use of it to take water, and that the expense of repairs should be paid by them jointly. Boodle v. Davies, 3 Adolph. & Ellis, 200.
3. The next objection is, that the commissioners exceeded *177 their authority, in making observations and experiments, at the mutual expense of these parties, to determine the whole number of mill powers, which the basins would furnish, being a question m which the defendant, as lessee of some of those powers, had no interest. But it appears to us, that this exception is not well taken, and that there are various grounds, upon which it was proper for the commissioners, as an incidental authority, to determine what was the whole water power of these basins; and that it is by no means apparent that the lessee had no interest in this inquiry.
The fifth article provides that the company shall make no more leases of water power, until the final award of the commissioners, without their permission and license. So in the sixth, it is provided, that if the commissioners, after hearing, shall find as a determinate fact, that said Gray and his assigns have not, at all times, had their full quantity of water, the commissioners may direct how and to what extent the company shall be restrained in their own use of the water, so as to preserve to said Gray the full use of his powers under the lease; and this may continue until the commissioners shall otherwise order, or til. the publication of their final award.
These clauses involve several necessary implications. The first is, a doubt whether the company could grant any further ’eases, consistently with the prior right granted to Mr. Gray; and the next clause implies a like doubt whether they had not already, by their own mills, and by leases to others, assumed to use more mill powers than could all be used at the same time, consistently with Mr. Gray’s prior right. And in both articles, which provide for temporary measures, during the pendency of the investigation, there is a clear and necessary implication that this is to be regulated by their final award. But it could not be known whether more sluices had already been opened, for supplying mill powers, than the basins could supply, or whether any, and how many, more might be opened, consistently with the full enjoyment, by Mr. Gray, of his full powers, without first ascertaining the capacity of the whole basins. The commissioners had power to award the specific performance of such *178 things as they should judge necessary to the security and enjoyment of the rights of the parties. If more sluices should be opened than the power of the basins could supply, and supply at all times, they would have power to award, that certain of them should be closed, either permanently or at certain times of tide, so as not to interfere with the rights and powers of Mr Gray ; and the enforcing of a specific performance of such an award might afford a much more effectual security, during the long period for which his term is to continue, than any mere covenant or personal obligation of the lessors or their assigns could afford. It appears to us, therefore, that the commissioners did not exceed their authority, in proceeding, by observations and experiments, to ascertain and determine the number of mill powers which the said basins would afford, at any and every tide.
4. The next ground of objection is, that the commissioners exceeded their authority, in deciding that the Water Power Company should remove accretions from the basins; they not being the owners of the same. This is the sixth article oí the award, in which they express their opinion that the WaterPower Company have a legal right to enter on the receiving basin, and to remove obstructions to their water power, arising from accretions, and that they are legally bound to do so, whenever it shall be necessary to the full enjoyment of the privilege or mill powers granted to said Gray by the said lease. In the close of their report, they award and order that whatsoever is therein directed to be done by either of the parties shall be specifically performed by the said party. The two provisions together give to the lessee a new and more efficient remedy for securing the enjoyment of his rights. By the lease, the powers were granted to him, and perhaps some of the covenants would have given him a remedy by action for any detention of the rights granted; though it may be doubtful whether any of his covenants extended to secure him against a permissive diminution of his powers by obstructions in the basin. But suppose they would; a mere action for damages, after he had erected and completed extensive works, would have afforded but an inadequate remedy for the *179 loss or gradual diminution of the power necessary to carry on those works. But the effect of the submission and award was not merely to assure him of the result, but to secure to him the specific means by which it was to be obtained. Now, if his right is impaired by accretions, diminishing the capacity of the receiving basin, he has a remedy, by which the specific power is restored, instead of an uncertain compensation in damages. But it is said, that, however beneficial, the commissioners could not order it, for this, among other reasons, that the company were not the owners of the soil. This does not appear; but suppose it be so, the commissioners find that in their opinion the company have a right to enter and remove such accretions ; and whether this results from absolute ownership, or from a right in nature of an easement appendant to their mills, and resulting from the grant of the Commonwealth or otherwise, is immaterial; it is equally in their power to do the act, equally beneficial to the lessee to have it done ; and thus it was within the authority of the commissioners to order it done.
But it is further argued, that if this duty was required at all, it should have been imposed upon the Boston and Roxbury Mill Corporation, because they were the original grantors and covenantors. True; but they had transferred the whole estate and interest, to which that covenant was incident, to the Water Power Company, and, for aught that appears, with the consent of the lessee. Besides; the whole rent, which is the consideration for those obligations of the lessors to keep the premises in a condition to yield rent, had been transferred to the Water Power Company, and it was equitable to lay the correlative duty upon them. At all events, there was sufficient ground to warrant the commissioners in exercising their judgment, in deciding what the rights of the lessee required in this respect.
5. The next alleged departure from their authority by the commissioners is, that they direct the water to be measured, after it has passed the mills, and not before. But it was nowhere stipulated that it should be so measured, and it cannot re suit from the trifling circumstance, that the word “ measured *180 precedes the word “ delivered,” in the sentence. Even in the original lease, in which it was stipulated that the agents of the corporation might enter the premises, and examine the water courses, and keep a gauge there, it was not required to be either in the water course leading to the mills or from them; it was optional. It was, amongst other things, objected to this measuring apparatus, that it could not be used all the time, without great expense of men to watch it. But it may answer a useful purpose without being used all the time. As a ship’s log at sea may be used from time to time to ascertain the rate of a ship’s running, from which an average can be obtained for practica, purposes, so this apparatus may be used in various heights of the water, with more or fewer wheels running, from which a proximate average can be obtained. That it was intended so to be used, may be inferred from the provision, that it shall be so made as to be capable of being hoisted out, when not in use.
6. The last exception under this head is, that in deciding upon said Gray’s claim for damages, sustained before the submission, by reason of occasional deficiencies of water, the commissioners award, that he ought not to recover, because, in their opinion, it must have been understood by the parties, that the water power would necessarily be liable to occasional short deficiencies, from the manner in which it was created. It is said that the stipulation for ten powers was absolute, and without exception. It is certainly a well known rule of exposition, to construe stipulations according to the subject, with more or less latitude oi stiictness. But it is to be recollected, that in deciding upon these claims for past damage, to regulate another board of referees, the decision of these commissioners was to be absolute and decisive. They have decided against it. Suppose they have given an insufficient reason for it, it would show unsound ness of reasoning, not a defect of power. But in truth they have given two other reasons for it, either of which wo¿Id be decisive; namely, because the said Gray had enjoyed an excess over two and a half additional powers, as before stated, and pe cause of his acquiescence as aforesaid.
The defendant now relies upon another class of objection^ *181 which are, that the award was invalid, on account of palpable errors and mistakes, either apparent upon the face of the award, or shown by evidence aliunde.
We have no doubt that the rule adopted at the trial was correct, by which it was held that an award, like the present, where all questions, both of law and fact, were referred, may be impeached and avoided by proof of fraud, accident or mistake. But it must be fraud practised upon the referees, or some accident or mistake, by which they were deceived and misled, so that the award is not, in fact, the result of their judgment. In a certain loose sense, the arbitrators may be said to have fallen into an error or mistake, a palpable mistake, when they have judged wrong upon the evidence before them. This is not the kind of error and mistake intended; because, so far as they have exercised their judgment, it is conclusive, though the result might, to otfer minds, seem palpably erroneous. In the case of Wood v. Griffith, 1 Swanst. 55, before Lord Eldon, where an arbitrator, in a case in chancery, had ordered the parties to join in a sale of an estate in controversy, although it was urged, that under the circumstances, the estate could not be sold advantageously, and that the order was unreasonable, and such appeared to be the strong leaning of the chancellor, yet he decided that the court would not inquire whether the award was unreasonable. Courts will not set aside an award, for mistake of the arbitrator, where the facts were placed before him, and he was competent to judge. Hardy v. Ringrose, 1 Har. & Woll. 185, as cited in 4 Harrison’s Digest, (Amer. ed.) 2296. The mistake or accident, therefore, must be of some fact which deceived and misled the arbitrators, and not a mistake in drawing conclusions of fact from evidence or observation, or mistake in adopting erroneous rules of law, or theories of philosophy. Several illustrations were given at the trial; and it may be well to mark the distinction intended, by another. Suppose it were referred to arbitrators to measure a large area, where it would be necessary to run lines through woods, by the aid of a compass. Suppose, through fraud or accident, a piece of steel had been so placed, near the compass, as to disturb the regular *182 action of the needle, and this wholly unknown to the arbitrators, who were thus led to adopt false courses as true, as the basis of computation. If this fact could be afterwards proved, it would, we think, be good ground to set aside the award. But if they adopted a theory of magnetism, in regard to the actual variation of the compass, alleged to be erroneous, and leading to the adoption of a similar erroneous series' of courses ; although it should be pronounced erroneous by other philosophers, conversant with all that is known of the science of magnetism, whatever might be their number, or weight of authority, we think they could not be heard by a court and jury, because it would not tend to prove the kind of error or mistake, which had misled the constituted judges in the case, but would be an appeal from their decision in a case where they have exercised their judgment.
So, to put one more instance, suppose, in making mathematical computations, they had used tables of logarithms, believed by them to be correct, which are afterward shown to be erroneous. It would be a mistake that misled them. But if they adopted, purposely and deliberately, a process of mathematical reasoning which they believed to be correct, their award could not be impugned by the testimony of other mathematicians, tending to show that it was erroneous.
The rule adopted at nisi prius, for the purpose of this trial, was, as I have before intimated, that in showing gross errors and palpable mistakes in an award — using those terms as herein illustrated, explained and limited — by the law of this Commonwealth, the party impeaching the award is not confined to errors and mistakes apparent on the award; but that evidence might be given of any such plain, palpable mistake or gross error, though it was not apparent on the face of the award; that they might show, if they could, that the commissioners, through inadvertence or mistake, assumed a fact as true, which was not true, or overlooked some material fact, which was true, in either case affecting their decision.
As this part of the rule, admitting evidence to prove mistakes not apparent on the award, was favorable to the defendant, and therefore not excepted to by him; as the other party seeks to *183 establish the verdict, and therefore had no cause to take any exception to this decision at nisi prius; it has not been brought under the consideration of the whole court, and not therefore affirmed by the decision in this case. In other respects, the court are of opinion that the rule adopted at the trial was correct.
We will refer to some of the errors and mistakes relied upon to invalidate this award.
The first is, that there was no allowance made for loss of read of water, in getting the water on to the wheels, and loss of power by the spilling out of water from the wheels, before its regular discharge.
After the fullest and most attentive consideration of the very long and laborious computations made at the argument, we cannot perceive any such mistake. In the first place, no fact was proved, showing that the commissioners were misled or deceived. Mr. Hayward, one of the commissioners, was called as a witness. He was asked what formula the commissioners adopted, by which they came to the result stated in the table. This question was objectionable, strictly speaking, because it assumed a fact not proved, but denied on the other side, viz. that the table was constructed by some formula which the witness had not stated. Regularly, he should have been first asked whether the table was constructed by a formula. But without placing any reliance upon this mere irregularity, the direct object of the question was to show what formula or "rule they adopted, by which the tables were constructed; that is, the rules, principles and deductions by which they prescribed the measures of mill power ; with a view to prove that such formula or rule was erroneous. The question therefore was clearly excluded by the rule adopted.
But the great effort has been, to convince the court, by extensive and laborious comparisons of one part of the table with another, that it is founded upon false theories either of hydraulics or of mathematics, and that it is founded upon rules which if carried out to their legitimate consequences, will lead to absurd conclusions. But in the first place, this is contradicted by *184 the a.ward itself, in which the commissioners state, that these tables, to a certain extent, were the result of a long course of experiments, of observed facts, and deductions from them. But the more material and conclusive answer is, that the supposed error, whether it be of philosophical theory, or of mathematical deduction, was of a subject wholly submitted to the judgment of the arbitrators, and the conclusion was the result of their judgment; this is, therefore, an attempt to show that the com missioners judged wrong in a matter submitted to them. But as all such matters were submitted to their judgment, that judgment is conclusive, as well upon the court as the jury.
Another exception was, that the award was not made throughout from experiments, nor correctly deduced as the result of experiments. We cannot perceive the ground of this objection. The commissioners were authorized to resort to every other source of information, as well as experiments, and they state the conclusion as the result of their inquiries.
It is then stated, that during the experiments in grinding, made to ascertain a mill power, according to the standard prescribed in the lease, the mill stones were picked more frequently, and kept sharper, than their ordinary medium condition; by which less water was taken than if kept in that medium condition. If it had been in the power of the defendant to prove that the commissioners were misled or deceived as to the state of the mill stones, that is, if, in making their experiments, they intended to use the stones in their ordinary and medium state of sharpness, picked as frequently as usual, and not oftener, but through the fraud, officiousness, or even mistake of others, they were kept constantly sharp, and this unknown to the commissioners, it was quite open, by the rule adopted at the trial, to offer this evidence. But if the commissioners, knowing and directing the actual state of the mill stones, made their experiments under a belief that they were conforming to the standard prescribed in the submission and lease, then they passed their judgment on the subject how this clause prescribing the standard measure of a mill power should be construed, and that was conclusive. As the large sum of $ 1400 was paid for the use *185 of the mills, for making these trials, the probability is that a large number of experiments were made, under almost every variety of condition, both of the height of water in the full and receiving basins, and of the condition of the mill and mill stones.
It is next alleged as a palpable error and mistake, that the commissioners took 54 pounds of rye, when the standard, fixed by law, is 56 pounds. We are not aware of any„proof of the fact, on which the exception rests. Besides, it was a question of construction as to what the parties intended by a bushel, and if the standard they adopted was not adopted through error or mistake, by which the commissioners were misled, the award is not to be avoided on that account.
Various other exceptions are taken, which I shall not now follow in detail. They are fully disposed of under some of the considerations already stated; and the court are of opinior that none of them is sufficient to avoid or set aside the award
One more objection seems to me to deserve notice. It was .god that the commissioners do, by implication, impair the rights of the lessee, by declaring that he shall be entitled to use his eight powers, so long as the said basins will furnish the same; whereas, by the lease, he is entitled to said powers absolutely, and without any such limitation.
It appears to us that this is founded upon a misconstruction of the terms of the award. The award is expressed in articles. By article 3d the commissioners express their opinion, and do award, that the said Gray, and those claiming under him, (not including Messrs. Boott and Lyman, who, we believe, had become assignees of two of the ten powers,) are legally entitled to eight full powers during the remainder of the term, to use and enjoy the same, at all times, by night as well as by day. This is the close of the article. Nothing could be more explicit, absolute and unconditional. The supposed limitation by implication is in the next clause, article 4th. By it, the commissioners express an opinion and do award that said Gray, and those claiming under him, are entitled to the use of said eight mill powers so long as the said basins will furnish the same ; and as *186 between the said Water Power Company and said Gray, and those claiming under him, they have a legal right to be first fully served, to the extent of said eight powers; and that the company are legally bound to discontinue, and shall discontinue, their own mills, in part or altogether, so long as may be necessary to the full use and enjoyment of the mill powers belonging to said Gray.
Taking the two articles together, therefore, so far from an implication, limiting the right of said Gray, in the use of his mill powers, to such term of time only as the basins shall furnish the same, it awards to him, in terms, his full powers, for the whole term, at all times, and gives him a specific remedy for the enjoyment of them, by closing up the mills of the other party, if necessary; it secures to him the first right, as long as the basins will afford it. If the basins will not afford it, he cannot have it specifically ; but the award leaves to him the use and enjoyment of every other remedy, as fully as if this remedy for specific performance had not been awarded.

Judgment for the plaintiffs.

Hubbard, J. did not sit in this ca«p